IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KENNETH LEE KASER, | ) | Case No. 5:20-CV-2562 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION**[1] |

## I.      Introduction

Plaintiff, Kenneth Kaser, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for supplemental security income ("SSI") under title XVI of the Social Security Act.  He challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ's residual functional capacity ("RFC") determination was not supported by substantial evidence and the ALJ misevaluated his subjective symptom complaints.  Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Kaser's application for SSI be affirmed.

## II.      Procedural History

On April 17, 2017, Kaser applied for SSI.  (Tr. 217-218).[2]  Kaser alleged that he became disabled on March 13, 2017 due to agoraphobia, anxiety, back pain, short-term memory

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).
[2] The administrative transcript appears in ECF Doc. 10.

problems, and a heart attack.  (Tr. 237, 243).  The Social Security Administration denied Kaser's application initially and upon reconsideration.  (Tr. 102-120, 122-139).  Kaser requested an administrative hearing.  (Tr. 154-155).

ALJ Susan Smoot heard Kaser's case on November 5, 2019 and denied the claims in a January 23, 2020 decision.  (Tr. 15-35).  At Step Four of the sequential evaluation process, the ALJ determined that Kaser had the residual functional capacity ("RFC") to perform sedentary work but with the following limitations:

> [Kaser] can occasionally climb ramps and stairs and never climb ladders, ropes and scaffolds.  He can occasionally stoop, kneel, crouch and crawl.  He can perform simple, routine tasks in an environment free of fast-paced production requirements or strict production quotas and with infrequent changes, and with changes explained.  He can have occasional, superficial interaction with others, (superficial meaning, the claimant should not be required to perform tasks that involve arbitration, confrontation, negotiation, directing the work of others or being responsible for the safety and welfare of others).

(Tr. 24).  Based on vocational expert testimony that an individual with Kaser's age, experience, and RFC could work in available occupations as a document preparer; addresser; inspector, tester, sorter, table worker, the ALJ determined that Kaser wasn't disabled because he could perform a significant number of jobs in the national economy.  (Tr. 35).  On September 9, 2020, the Appeals Council declined further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).

## III.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Kaser was born on December 4, 1972 and was 44 years old on the alleged onset day of his disability.  (Tr. 243).  He completed high school and completed training in auto and diesel technology.  (Tr. 49, 238).  He had previously work experienced as a truck driver.  (Tr. 238).

### B.      Relevant Medical Evidence:

In 2008, Kaser saw Liza Talampas, MD, after injuring his back bending over and was prescribed pain medication.  (Tr. 303-304).  But he later stopped the medication for some months, before returning to it.  (Tr. 305-306).  In 2010, he had an MRI done for lower back pain that showed a "very small central disc protrusion."  (Tr. 282-283).

In January 2013, records indicate that Kaser received a prescription to have his shower converted to accommodate a handheld shower device, grab bars, and a bath/shower chair. (Tr. 411).  In June 2013, Kaser also received a prescription for a wheelchair.  *Id.*

In September 2016, Kaser was hospitalized for atypical chest pain that resulted in him having a heart catherization and a percutaneous coronary intervention procedure, which involved the placement of a stent.  (Tr. 338, 355).

In April 2017, Kaser or his mother called CCF Wooster, a healthcare provider associated with the Cleveland Clinic, three times regarding medication.  (Tr. 394, 559-560).  During the first call, his mother requested a sedative for him, in order to help him travel to an upcoming appointment, which the doctor prescribed.  (Tr. 394).  The latter two requests for medication were denied because Kaser had not had an appointment in over 18 months.  (Tr. 559-560).

On May 19, 2017, a phone call between Kaser and the Cleveland Clinic indicated that he was experiencing moderately severe depression and agoraphobia, which caused him to not leave his house.  (Tr. 414).

On May 25, 2017, Kaser had an initial visit with Bobbi Messner, RN, to establish at-home care.  (Tr. 460-461).  Nurse Messner noted that Kaser used assistive devices and had diagnoses of agoraphobia, major depressive disorder, chronic pain syndrome, morbid obesity, hypertension, and long-term use of anticoagulants.  (Tr. 462).  She reported that Kaser's activity

3

was limited, and he struggled to leave home based on his shortness of breath with minimal exertion, limited ambulation, mental health impairment, fear of leaving home, unsteady gait/poor balance, fair deficit, fall risk, and chairfast status. *Id*. She also noted that Kaser was homebound because of the "taxing effort" it as to walk long distances, caused by his pain, weakness, impaired mobility, shortness of breath, fear of leaving home, need for assistive devices, and need for supervision. *Id.* In regard to Kaser's mental status, Nurse Messner noted that he was forgetful, depressed, and anxious. (Tr. 464).

Nurse Messner also found that Kaser's ability to walk was severely limited or non-existent; he had heartburn, diarrhea, a history of depression and anxiety; and he had impaired decision-making. (Tr. 465-467). Regarding his musculoskeletal and neurological symptoms, she indicated that he had a history of arthritis and had stiffness, joint pain, weakness, numbness, and decreased range of motion. (Tr. 467). She noted that Kaser depended on someone else for his personal care and required assistance to stand or walk. (Tr. 468).

On May 25, 2017, the Visiting Nurse Association ("VNA") established a home health care plan for Kaser, which indicated that he had limitations regarding incontinence, endurance, ambulation, dysposa with minimal exertion, moving from his bed to a chair, use of a cane or wheelchair, and activity. (Tr. 426). His mental status was reported as orientated, forgetful, and depressed. *Id.* The VNA assessment also stated that Kaser was homebound because his conditions, specifically his shortness of breath with minimal exertion, limited ambulation, unsteady gait/poor balance/gait deficit, and fear of leaving home. (Tr. 427).

From June 12 to July 7, 2017, Kaser was seen by Sharon Johnson, RN, from the VNA. (Tr. 435-458). During her first visit, Nurse Johnson reported that Kaser was alert and orientated, spoke readily, initiated conversation, maintained eye contact, and was in no apparent distress.

(Tr. 457).  Kaser reported that he had been chronically depressed since injuring his back "years ago" and that his anger stemmed from his inability to do things rather than from his pain, which he "enjoy[ed]."  *Id.*  He reported drinking "whenever he can get it to cope" and that the doctor would not prescribe him anything stronger than over-the-counter medication.  *Id.*  He also reported that he did not want to leave the house and had not been out for two years.  *Id.*  He stated that he was currently married but lived with his wife and her boyfriend.  *Id.*  Nurse Johnson reported that Kaser appeared to have minimal support from his wife and that the home was "filthy."  *Id.*  She noted that Kaser had not been to have teeth pulled or see his cardiologist "due to finances and transport issues."  *Id.*

During Nurse Johnson's subsequent visits, she physically noted that Kaser still left home only with "taxing effort" due to his weakness, chronic pain, dependence on assistive devices, and desire not to.  (Tr. 438-440, 442, 449).  During one of the visits, she attributed his homebound status to his physical state.  (Tr. 442).  As to his mood, she noted that he was alert, orientated, talkative, and was in a "pretty good mood," noting that he spent most of his day playing video games.  (Tr. 442, 450-451).  Subsequently, Kaser was discharged by VNA because he had asserted that he was feeling better, being more positive because he obtained a new line of credit, and that he could "handle his anxiety issues."  (Tr. 476-478).

On October 12, 2017, Kaser went to the emergency room for difficulty swallowing, burning in his epigastric region, and vomiting.  (Tr. 490).  The doctor's impression was that he had hyperglycemia without ketosis.  *Id.*  He was discharged the following day with a primary diagnosis of acute type-two diabetes.  (Tr. 503).

On October 13, 2017, Kaser again called to have his prescriptions refilled, but was denied because he kept making appointments and then canceling them.  (Tr. 548).

5

On October 23, 2017, Kaser met with Terri Brooks, CNS, for an appointment following his hospitalization and diabetes diagnosis.  (Tr. 540-541).  He reported that his GERD was well controlled with medication, he was doing well on his antidepressant, and he was able to walk short distances.  (Tr. 541).  Nurse Brooks observed that Kaser's gait was normal.  (Tr. 542).  She recommended that he continued to control his diabetes through his diet.  (Tr. 545).

On October 24, 2017, Kaser saw James Kennedy, RN, with the VNA, because of his new diabetes diagnosis.  (Tr. 671).  Nurse Kennedy noted that Kaser had a "normal inability to leave home" because of his morbid obesity, progressive generalized weakness, and unsteady gait.  *Id*. He also reported that Kaser needed "occasional assistance" with his daily activities, due to his back pain.  (Tr. 679).  He observed that Kaser was alert, orientated, able to focus and shift his attention, and comprehend and recall tasks.  (Tr. 692).  Kaser did not report any symptoms of depression nor demonstrate any "cognitive, behavioral [or] psychiatric symptoms." (Tr. 692-693).  Kaser did report that his pain was a 6 out of 10.  (Tr. 693).

Nurse Kennedy also found that Kaser had clear comprehension, his sensory perception was not impaired, he could walk for short distances, his musculoskeletal and functional assessment was within normal limits, and he could groom, dress, and bathe himself unaided and take care of his personal needs.  (Tr. 694-697).  Nurse Kennedy also indicated that Kaser could move from his bed to a chair, sit up in bed, and walk upstairs independently.  (Tr. 696). However, Kaser was noted as being as risk for falls.  (Tr. 697).

On October 27, 2019, Kaser missed his appointment with the VNA.  (Tr. 681).  On October 30, 2019, Kaser was seen by another nurse from the VNA.  (Tr. 704).  The nurse indicated that Kaser was homebound because of his shortness of breath, ambulation, and the "significant and taxing effort."  (Tr. 704-705).  Kaser's cognitive, neurological, and behavioral

assessments all indicated he was within normal limits.  (Tr. 705).  However, he reported that his

pain was an 8 out of 10.  *Id.*  He also indicated having dyspnea and hyperglycemia.  *Id.*  Kaser

was not reported to be bedbound.  (Tr. 706).  He was instructed on the importance of a diabetic

diet. *Id.*

On November 13 and 17, 2017, Kaser missed his appointment with the VNA.  (Tr. 683,

685).  On November 21, 2017, Kaser was again seen by a nurse from the VNA.  (Tr. 708).  Kaser

was found not be homebound, as he was within normal limits cognitively, reported not having

any pain or shortness of breath, and he indicated he could care for himself.  (Tr. 709-712).  He

was not diagnosed with depression.  (Tr. 712).  He was subsequently discharged.  (Tr. 713).

On May 4, 2018, Kaser's mother called CCF Wooster to cancel his appointment due to

extreme paranoia and him refusing to come out of his apartment.  (Tr. 575).  She requested a

referral to a psychiatrist.  *Id.*

On June 11, 2018, Kaser was seen by Mona Park, MS LPCC-SUPV, of the Counseling

Center, complaining of his depression and anxiety.  (Tr. 587).  Kaser reported that he would like

in-home services, and he had noticed an increase in his depressive mood, difficulty focusing and

concentrating, anxiety and nervousness, difficulty controlling worrying thoughts, difficulty

relaxing, and irritability.  *Id.*  Kaser also reported that he was limited in his ability to care for

himself and his daily living activities, he had limited mobility and relied on a wheelchair, and he

enjoyed watching television and reading.  (Tr. 581-582).

Dr. Park noted that Kaser was unremarkable in his behavior, soft and slow in his speech,

had poor frustration tolerance, was withdrawn, and reported difficulty sleeping; was anxious and

hostile in affect; had impaired concentration and flight of ideas in his thought process; and had

ruminating thought content.  (Tr. 583).  He was also noted to have difficulty with his short-term

memory and had average intellectual functioning.  (Tr. 584).  Kaser was diagnosed with a recurrent, moderate, major depressive disorder and generalized anxiety disorder.  (Tr. 585).

On June 14, 2018 and August 16, 2018, Kaser or his mother were denied further medications because of his cancelled or missed appointments.  (Tr. 595, 602-603).

On September 24, 2018, Kaser again saw Nurse Brooks.  (Tr. 764).  Kaser reported that he needed a physical examination for social security, and that he did not have any chest pain, shortness of breath, dizziness, or light headedness, was trying to follow the diabetic diet, was not experiencing any GERD symptoms, and had run out of medication.  (Tr. 764-766).  On physical examination, he was noted as being seated in his wheelchair and hesitated to move but had an ataxic gait.  (Tr. 768).  Nurse Brooks assessed that he had hyperlipidemia, hypertension, diabetes, GERD, and chronic pain syndrome.  (Tr. 772).

From October 30, 2018, to January 31, 2019, Kaser either cancelled or did not attend four appointments with the Counseling Center.  (Tr. 641-644).

On March 5, 2019, Kaser underwent an initial psychiatric evaluation with Brenda McKinstry, APN, of the Counseling Center.  (Tr. 646).  Kaser reported that he had a fear of leaving the house for the past 5 to 6 years and hurt his back 9 to 10 years ago by "just walking and fell" and he now had degenerative joint disease and had to use a wheelchair and cane.  *Id.* Nurse McKinstry noted that Kaser was obese; had a stuffy nose, severe back pain, various skin conditions, depression, diabetes, high cholesterol, and had previously had a heart attack.  *Id.*  A physical exam showed that he was alert, orientated, and in a wheelchair, and he reported severe back pain that decreased his mobility.  *Id.*  Nurse McKinstry noted that Kaser was anxious and full in affect, and had pessimistic thoughts and thought processes, but he was otherwise within normal limits for his mental status.  (Tr. 647).  She did not add to Dr. Park's prior diagnoses.  *Id.*

On April 4, April 9, May 2, and May 9, 2019, Kaser canceled his three appointments with the Counseling Center.  (Tr. 649-653).

On May 23, 2019, Kaser saw Liza Talamas, MD, presenting with heartburn and swelling in his right leg.  (Tr. 780).  Dr. Talamas noted that Kaser's affect was "bright" and "reactive" and that his gait was antalgic.  (Tr. 782-783).

On June 5, 2019, Kaser's mother called the Counseling Center and informed them that Kaser was intending to come to his appointment the following day, but he had also been recently told that he was in the end stages of kidney failure and his iron was dangerously low.  (Tr. 655). Kaser had also recently lost his father and, according to her, he was struggling with that.  *Id.*  She stated that he had told her that if it were not for his kids, he would shoot himself.  *Id.*

On June 6, 2019, the staff cancelled Kaser's appointment.  (Tr. 656).  Kaser's wife had an appointment and informed them to cancel Kaser's because he would not come, stating "I know his mom called you yesterday, and said he was depressed and said he would shoot hisself if not for them kids[.]  That's not realistic.  Besides he sold all his guns along time ago.  His problem is not [agoraphobia], its lazy."  (Tr. 657).  She also stated that Kaser said he was probably not coming back to counseling.  *Id.*

On June 20, 2019, Kaser called and stated that his primary care physician informed him he needed to see Nurse McKinstry and he scheduled an appointment for July.  (Tr. 659).  Kaser was a no-show for that appointment.  (Tr. 660).

### C.  Relevant Opinion Evidence

#### 1.  Consultive Examination – Randy Plona, DO

On February 8, 2018, Kaser was examined by Randy Plona, DO, regarding his occupational health.  (Tr. 518, 521).  Kaser reported that he had suffered a back injury from a car

9

accident that had caused a herniated disc in his lower back and nerve root compression. (Tr. 518).  Kaser indicated that the pain was an 8 or 9 out of 10, located in the lower lumbar region of his spine, with radiation down his left leg.  *Id.*  He also reported a history of morbid obesity, diabetes, anxiety, depression, GERD, hypertension, hypercholesterolemia, and a myocardial infarction.  (Tr. 519).

Dr. Plona reported that Kaser had difficulty moving around for the examination.  *Id.* Neurologically, he reported that Kaser had no overt motor or sensory deficits, his bilateral lower extremity weakness was relative to his obesity, and manual muscle testing showed that his muscles were normal.  (Tr. 520).  However, Kaser stayed in his wheelchair for the entire exam. *Id.*  His upper and lower extremities were noted as appearing essentially normal and he had no muscle spasms or abnormal reflexes.  *Id.*  Dr. Plona assessed that Kaser had no musculoskeletal limitations, but that he required a wheelchair for any movement or transportation, could only rarely stand and walk a maximum of 15 feet away from his wheelchair before his left leg started to give out, had no limitations regarding his sitting, standing was limited to 1 to 2 minutes per hour, he could never bend or stoop, he could not navigate uneven surfaces, climb stairs, or climb ladders; and he could lift 10 pound continuously and 20 pounds rarely.  (Tr. 521).  He also noted that Kaser had a normal psychiatric affect.  *Id.*

### 2.     State Agency Consultants

On February 14, 2018, Anton Freihofner, MD, evaluated Kaser's RFC based on the medical evidence.  (Tr. 116-117).  He adopted the RFC from an earlier SSA determination against Kaser in 2016.  (Tr. 117).  On October 12, 2018, Elizabeth Das, MD, tried to evaluate Kaser's RFC but was unable to because Kaser required an at-home evaluation, which was not available in his area.  (Tr. 131).

10

On January 11, 2018, Leslie Rudy, PhD, evaluated Kaser's mental health based on the medical evidence.  (Tr. 114-115).  Dr. Rudy found that Kaser had moderate limitations in his interaction with others and his concentration, persistence, and pace, but was only mildly limited in his ability to understand, remember, or apply information, and his ability to adapt or manage himself.  (Tr. 115).  She also noted inconsistencies between Kaser's allegations and the available medical evidence, ultimately adopting the mental RFC from Kaser's prior application.  (Tr. 117).

On July 26, 2018, Janet Souder, PsyD, evaluated Kaser's mental health based on the medical evidence and found that he had moderate limitations across his mental functioning domains.  (Tr. 132, 134-136).  Regarding his concentration and pace, she found that Kaser had moderate limitations in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday and workweek without interruption from psychologically based symptoms; the latter of which she explained further, stating Kaser could "carry out simple instructions in a setting without strict quotas, fast pace, or high protection demands."  (Tr. 135).

### D.     Relevant Testimonial Evidence

Kaser testified at the ALJ hearing.  (Tr. 46-71).  He lived in an apartment with his wife and two children.  (Tr. 47).  He used to have a driver's license but let it expire about five to seven years earlier because he was having blackout periods when driving.  (Tr. 48).  He rarely left the house, but when he did, his wife took him.  *Id.*  He had previously worked as a propane delivery driver, a "garbage man," as a tow-truck driver, and as a delivery driver.  (Tr. 50, 52-54).  He stopped working in 2008 because he injured his back after picking up his son.  (Tr. 55).  Physical therapy only worsened his pain, and he was told that surgery could do the same.  (Tr. 55-56).  He was prescribed a wheelchair and has used one for the past ten years.  (Tr. 56).  He used a

wheelchair inside and outside of his apartment because, if he stood too long, he would collapse, due to his back and legs.  (Tr. 56-57).  Most of the time, he laid in bed on his side with a pillow between his legs because that was the only comfortable position for him.  (Tr. 58).  He would use a cane for short distances.  *Id.*  He spoke with his doctor about trying physical therapy, but, about six months prior, he started bleeding internally and the doctors wanted to resolve that first. (Tr. 57-58).  "Any time [he's] up for more than just a few seconds," his leg would give out unexpectedly and, he lacked feeling in it.  (Tr. 58-59).  His diabetes was under reasonable control.  (Tr. 59-60).

Kaser also explained that he had bad arthritis in his right elbow, for which he had not sought treatment.  (Tr. 60).  He had constant pain in his lower back, for which he took pain medication.  (Tr. 60-61).  He also had started being treated for mental health problems about a year prior and took medication for anxiety.  (Tr. 61).  The medication helped with his agoraphobia, although he still struggled to leave the house.  (Tr. 61-62).  Because of his agoraphobia, he had not been back to see his cardiologist since having his stent put in.  (Tr. 62).

A typical day for him involved lying in bed all day and only getting up when he needed to use the restroom.  *Id.*  He also experienced pain when he rode in a car.  (Tr. 63).  He only left to see the doctor and was trying to get in-home psychiatric counseling, but his prior psychiatrist had told him to find someone else because he had missed so many appointments.  *Id.*  He would spend about two to three hours a day on his computer.  (Tr. 64).  He would occasionally watch movies on his computer, and he would read as much as he could.  *Id*.  He did not see any family or friends beside his immediate family and his mother.  *Id.*

Kaser explained that he also struggled to take care of himself because he could not sit long enough in the shower chair.  (Tr. 65).  His wife would wipe him down and help him dress.

*Id.*  He did not do any household chores.  *Id.*  He clarified that he had arthritis in his joints, chest, and back and he struggled to hold things.  (Tr. 66).  His pain was constant at an 8 out of 10 and the only thing that helped was pain pills.  (Tr. 67).  He struggled to leave the house because of the combination of his physical and mental issues, actually making it to the doctors about four times that year.  (Tr. 67-68).  When he could leave the house for an appointment, he was in pain throughout the car ride and would think that he did not want to be near anyone.  (Tr. 68).  He felt uncomfortable around anyone he did not see day-to-day.  (Tr. 69).  His medication helped him get along with his family.  *Id.*  He did not have any issues with his long-term memories, but he struggled with his short-term memory, as he would forget things very quickly.  *Id.*  His wife reminded him to take his medication.  (Tr. 69-70).  He noticed issues with his concentration, in that he could focus on a movie but eventually would zone out.  (Tr. 70).  Kaser also experienced instances of panic, where he would get very nervous, have an upset stomach and diarrhea; sometimes those symptoms lasted for over a day.  (Tr. 70-71).

## IV.  Law & Analysis

### A.  Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quotation marks omitted).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ."

*O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks omitted).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And "it is not necessary that this court agree with the Commissioner's findings," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241.  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").  The court assesses the ALJ's findings by examining the entire decision; the court does not look for catch phrases or confine ourselves to what can be found in a single paragraph.  *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

B.      **Step Four: Ultimate RFC Assessment**

Kaser argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence in making her RFC findings.  ECF Doc. 11 at 5-12. Specifically, Kaser asserts that the ALJ failed to adequately account for or provide explanation of his limitations in concentration, persistence, and pace, which he asserts were supported by both the objective medical evidence and the state agency consultants' opinions.  ECF Doc. 11 at 6-9.  Kaser also asserts that the ALJ failed to adequately account for or discuss the impact that his use of a wheelchair or assistive device would have on his ability to work.  ECF Doc. 11 at 11-12.  Instead of reaching a reasoned decision based on the record as a whole, Kaser contends that the ALJ based her RFC assessment on her own interpretation of medical records and cherry-picked evidence to support that interpretation.  ECF Doc. 11 at 9-11.  The Commissioner disagrees.  ECF Doc. 13 at 10-16.

1.      **RFC Standard**

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

### 2.      Limitations in Concentration, Persistence, and Pace Standard and Analysis

In evaluating a medical source's opinions as part of the RFC determination, even if the ALJ finds the source's opinion to be persuasive or consistent and well-supported, "there is no requirement that an ALJ adopt [a medical source's] limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (unpublished).  So long as the ALJ's RFC determination considered the entire record, the ALJ is permitted to make necessary decisions about which medical findings to credit and which to reject in determining the claimant's RFC. *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013) (unpublished) ("The ALJ parsed the medical reports and made necessary decisions about which medical findings to credit, and which to reject.  Contrary to [the claimant's] contention, the ALJ had the authority to make these determinations.").  Concentration, persistence, or pace refers to the ability of a claimant to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings.  20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00C3.

The ALJ applied proper legal standards and reached a determination supported by substantial evidence in deciding Kaser's ultimate RFC.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Primarily, Kaser contends that the ALJ failed to incorporate Dr. Souder's limitations that he would have difficulty: (1) maintaining attention and concentration, and (2) performing at a consistent pace without interruptions.  ECF Doc. 11 at 7.  However, as to the consistency of his pace, Kaser's argument truncates the specific limitations that Dr. Souder found.  She explained that Kaser "[could] carry out simple instructions in a setting without strict quotas, fast pace or high production demands."  (Tr. 135).  Contrast this with the ALJ's RFC, which stated that Kaser could "perform simple, routine tasks in an environment free of fast-pace production requirements

16

or strict production quotas." (Tr. 24). Rather than ignoring Kaser's difficulties in maintaining a consistent pace without interruptions, as Kaser argues, the ALJ adopted nearly word-for-word Dr. Souder's specific limitation, despite not needing to. *Reeves*, 618 F. App'x at 275. Consequently, Kaser's assertion that the ALJ ignored Dr. Souder's specific limitation on the consistency of Kaser's pace is meritless.

As to the limitations for maintaining attention and concentration, the ALJ considered the impairment and accounted for it in the RFC. 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00C3; *Justice*, 515 F. App'x at 587. First, Kaser's contention that because the ALJ gave "significant weight" to Dr. Souder's opinion she *must* incorporate every part of the opinion in the RFC is faulty, based on the Sixth Circuit's reasoning in *Reeves*. *See Reeves*, 618 F. App'x at 275. This is particularly true in cases when, as here, the opinion did not define specific limitations regarding Kaser's ability to maintain attention and concentration. *See Ealy v. Comm's of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010) (remanding the ALJ's decision because the ALJ failed to include the specific limitations given by the credited medical expert in the hypothetical question posed to the VE, resulting in a hypothetical that did not accurately convey the RFC); *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x. 426, 436-37 (6th Cir. 2014) (distinguishing *Ealy* on the basis that Smith-Johnson's moderate limitations in concentration, persistence and pace were conveyed by the ALJ's hypothetical limitation to "simple, routine, and repetitive tasks" because Smith-Johnson's doctor "did not place any concrete functional limitations on her abilities to maintain attention, concentration, or pace when performing simple, repetitive, or routine tasks"); (Tr. at 135).

Regardless, the record indicates that the ALJ considered the limitation. She did so directly in her evaluation of Dr. Souder's opinion, but elsewhere in the decision as well.

20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00C3; *Justice*, 515 F. App'x at 587; *Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79.  In considering Kaser's mental impairments, the ALJ cited instances when medical providers had identified that Kaser was able to focus, shift attention, and comprehend information in finding he was limited to simple tasks.  (Tr. 22).  The ALJ noted these instances again when she explained her RFC finding, as well as when she discussed a mental status evaluation that noted Kaser's attention span and concentration were normal. (Tr. 26, 30, 32).  Further, the ALJ indicated that, despite his asserted difficulty focusing and concentrating, Kaser had also reported watching television for at least three hours a day and reading.  (Tr. 31-32).

Kaser has not identified any evidence to support his claim that the ALJ's RFC limitations failed to accommodate or were inconsistent with Dr. Souder's finding that he was moderately limited in his ability to maintain his attention and concentration.  ECF Doc. 11 at 6-9.  Simply stated, in light of the ALJ's reasoning, I cannot conclude that her RFC assessment was erroneous.  *See Mays v. Comm'r of Soc. Sec.*, No. 1:14-CV-647, 2015 U.S. Dist. LEXIS 105538, at *9-11 (S.D. Ohio Aug. 11, 2015) (affirming the ALJ's RFC because "[w]ithout further explanation by plaintiff or citation to evidence to support her argument that the RFC does not accommodate her moderate limitations in concentration and persistence, the Court cannot conclude that the ALJ's RFC assessment was erroneous").

Furthermore, as noted above, the ALJ's RFC determination was supported by substantial evidence.  *Biestek*, 139 S. Ct. at 1154.  Such evidence includes: (1) treatment notes indicating that Kaser was able to focus, shift attention, and comprehend information (Tr. 442, 451, 457, 484); (2) treatment notes indicating that Kaser's attention and concentration were "within normal limits" or his mental status was otherwise normal (Tr. 442, 451, 457, 484, 647); and (3) Kaser's

18

statements that he was on his computer for three hours a day, read "as much as he could," and reported playing videogames. (Tr. 64, 451, 581).  *Biestek*, 139 S. Ct. at 1154.  Accordingly, the ALJ's RFC determination, in this regard, fell within her discretionary authority or the Commissioner's "zone of choice."  *Mullen*, 800 F.2d at 545.  Kaser's first argument provides no basis for remand.

### 3.      Limitations for Assistive Devices Standard and Analysis

Generally, for an assistive device to be considered a restriction or limitation, there must be sufficient evidence in the record to obligate the ALJ to conclude that the device is "medically necessary," based on a showing that it is "more than just a subjective desire on the part of the plaintiff" to use it.  *See Murphy v. Astrue*, No. 2:11-CV-00114, 2013 U.S. Dist. LEXIS 30492, at *28 (M.D. Tenn. March 6, 2013) (internal citations omitted).  For an ALJ to find an assistive device medically necessary, there must be medical documentation establishing the need for the device to aid in walking or standing, and documentation "describing the circumstances for which it is needed (*i.e.*, whether all the time, periodically, or only in certain situations; distances and terrain; and any other relevant information)."  SSR 96-9p, 1996 SSR LEXIS 6, at *20.

A doctor's suggestion that a device be used or purchased – alone – is insufficient.  *Perry v. Berryhill*, No. 1:16-CV-2970, 2018 U.S. Dist. LEXIS 45609, at *10-11 (N.D. Ohio Mar. 20, 2018).  Generally, an ALJ's finding that a cane or other assistive device is not medically necessary is error when: (i) the claimant has been prescribed an assistive device, (ii) the ALJ did not include the use of the device in the RFC assessment, and (iii) did not explain the omission.  *Cruz-Ridolfi v. Comm'r of Soc. Sec.,* No. 1:17-CV-1075, 2018 U.S. Dist. LEXIS 32651, at *43 (N.D. Ohio Feb. 12, 2018).  However, when medical records do not contain a prescription for an assistive device, such as a cane, it is insufficient to establish that the device was medically

required, even if there were some indications in the medical records to establish that a plaintiff was using the device. *See Parrish v. Berryhill*, No. 1:16-CV-1880, 2017 U.S. Dist. LEXIS 97457, at *24 (N.D. Ohio June 8, 2017) (finding plaintiff failed to provide medical documentation indicating she was prescribed a cane, as required by SSR 96-9p, 1996 SSR LEXIS 6); *e.g., Mitchell v. Comm'r of Soc. Sec.*, No. 4:13-CV-1969, 2014 U.S. Dist. LEXIS 104106, at *22-23 (N.D. Ohio July 14, 2014) (finding that plaintiff's testimony regarding his need for a cane did not qualify as "medical documentation establishing the need" under SSR 96-9p, 1996 SSR LEXIS 6); *Miller v. Berryhill*, No. 1:18-CV-00140, 2019 U.S. Dist. LEXIS 99172, at *4-9 (W.D. Ky. Jun. 12, 2019) (finding that the lack of the actual wheelchair prescription, the scope of the claimant's need for it, the absence of evidence that the wheelchair was used for 12 months, and only an advance practice registered nurse's opinion that it was necessary was insufficient to undermine the ALJ's RFC).

The ALJ applied proper legal standards and reached a determination supported by substantial evidence in deciding not to include an RFC limitation based on Kaser's use of a wheelchair and cane. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. The ALJ noted several times that Kaser was seen in or using his wheelchair or cane, and that he testified that he relied on them to move. (Tr. 21, 25, 27-28). However, nothing in the medical record indicates that these devices were medically necessary. First, as to his cane, Kaser did not present any prescription for its use. As such, a necessary, but not sufficient, factor was absent for the ALJ to find that his cane was medical necessary. *See Parrish*, 2017 U.S. Dist. LEXIS 97457, at *24; *Miller*, 2019 U.S. Dist. LEXIS 99172, at *4-9.

Kaser did have evidence of a prescription for his wheelchair, however. (Tr. at 564). But that evidence fails to demonstrate the medical necessity of Kaser's wheelchair for purposes of

the instant ALJ decision. First, Kaser only provided a record that he had been provided a prescription for a wheelchair, not the actual prescription itself. *Miller*, 2019 U.S. Dist. LEXIS 99172, at *4-9; (Tr. 564). It lacked any accompanying description of why Kaser was to use the wheelchair, for how long, or under what circumstances. (Tr. 564). Further, the records indicated that the prescription was originally ordered in June 2013 – well before Kaser's alleged onset date. (Tr. 243). And without the description, there was no way for the ALJ to determine why the wheelchair was originally prescribed; whether following back surgery or injury or for an unrelated reason. Absent such information, the existence of a prescription – standing alone – was insufficient to demonstrate the medical necessity for Kaser to use a wheelchair. *Cruz-Ridolfi*, 2018 U.S. Dist. LEXIS 32651, at *43.

Substantial evidence supports the ALJ's decision not to include a limitation for assistive devices. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Such evidence includes: (1) Kaser's intact muscle strength examinations (Tr. 522-525); (2) Kaser's lack of sensory deficits (Tr. 520); (3) treatment notes indicating he had an antalgic gait or normal gait (Tr. 542, 768, 783); and (4) the lack of any muscle atrophy or spasms (Tr. 520). A reasonable person would find such evidence adequate to support the conclusion that Kaser's wheelchair and cane were not medically necessary. *Biestek*, 139 S. Ct. at 1154. And the ALJ's RFC finding, in this regard, is due to be affirmed.

### 4.    Cherry-Picking

An ALJ improperly "cherry-picks" evidence when her decision does not recognize a conflict between the functional limitations described in a medical opinion and the ALJ's RFC finding, and fails to explain why she chose to credit one portion over another. *See Rogers v. Comm'r of Soc. Sec.*, No. 5:17-cv-1087, 2018 U.S. Dist. LEXIS 68715 *44 (N.D. Ohio 2018)

21

(citing *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013)); *see also Fleischer*, 774 F. Supp. 2d at 881 (stating that, if a medical source's opinion contradicts the ALJ's RFC finding, the ALJ must explain why he did not include the limitation in his RFC determination). Claims that the ALJ "cherry-picked" the record are "seldom successful" because they essentially amount to a request that the court "re-weigh record evidence," which the court may not do. *Chicora v. Comm'r of Soc. Sec.*, 852 F. App'x 968, 971 (6th Cir. 2021) (citing *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014)).

The ALJ did not cherry-pick the record to construct her RFC.  Kaser points to three statements as having been cherry picked, specifically, the ALJ's finding that: (1) Kaser was capable of working based on having homeschooled his children, performing daily living activities, leaving home, and playing videogames or watching YouTube at least three hours a day; (2), except for his obesity, there was no clinical evidence to include he had significant back pain; and (3) "the claimant only received intermittent treatment for his lower back pain, which was most likely related to his morbid obesity." ECF Doc. 11 at 10.  Kaser's assertions regarding the first two statements call for the court to re-weigh the record evidence, contending that the ALJ failed to acknowledge why Kaser kept his computer on his bed or that he only "occasionally" watched movies or failed to include context that his children were older and did not require much supervision in their schooling.  *Jones*, 336 F.3d at 476; ECF Doc. 11 at 10. What Kaser has not done, however, is point to any contradictory evidence.  *See Rogers*, 2018 U.S. Dist. LEXIS 68715 *44; *Fleischer*, 774 F. Supp. 2d at 881.  It is well established that the ALJ need not cite every piece of evidence she considered and, as such, Kaser's argument as to the first two statements effectively requests the court to improperly re-weigh the ALJ's evaluation of the evidence.  *See Davidson v. Berryhill*, No. 3:16-CV-2621, 2017 U.S. Dist.

LEXIS 172519, at *47 (N.D. Ohio, Aug. 28, 2017) (finding that the ALJ need not discuss every piece of evidence in the record but may not fail to acknowledge evidence that potentially supports a finding of disability).

As to the third statement regarding the cause of his back pain, Kaser points to documents from before his alleged onset of disability.  ECF Doc. 11 at 11.  However, the ALJ expressly addressed this evidence, noting Kaser had a disc protrusion and attended physical therapy, took medication, and then stopped his medication for several months.  (Tr. 25).  As such, the ALJ did not "fail to recognize" or ignore the evidence but explained why such evidence did not support that his back pain was the result of a prior injury.  *See Fleischer*, 774 F. Supp. 2d at 881.  Consequently, the ALJ applied the proper procedures and must be affirmed.

### C.      Step Four: Evaluation of Subjective Symptom Complaints

Kaser argues that the ALJ erred by failing to consider *why* Kaser failed to pursue medical treatment in reaching her decision to discount Kaser's subjective complaints on the basis of sparse treatment history.  ECF Doc. 11 at 15.  Kaser asserts that the ALJ was required to consider his financial and mental limitations, and how those limitations might have made it difficult to leave home to obtain care, before she concluded that his lack of treatment history was inconsistent with his subjective symptom complaints.  ECF Doc. 11 at 15.  The Commissioner disagrees.  ECF Doc. 13 at 17-22.

A claimant's subjective symptom complaints are among the evidence that an ALJ must consider in assessing a claimant's RFC at Step Four.  *See* 20 C.F.R. § 416.920(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability.").  Generally, an ALJ must explain whether she finds the claimant's subjective complaints consistent with objective medical evidence and other evidence

in the record.  SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017); *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (The ALJ must clearly explain her reasons for discounting subjective complaints).  In conducting this analysis, the ALJ may consider several factors, including claimant's efforts to alleviate his symptoms, whether any treatment was effective, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. § 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).  The regulations don't require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports her decision.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

The ALJ may not find that the intensity and persistence of an individual's symptoms are inconsistent with the overall record evidence "without considering possible reasons [the claimant] may not comply with treatment," including that an "individual may not be able to afford treatment and may not have access to free or low-cost medical services."  *Cottrell v. Saul*, No. 6:20-CV-56-CHB, 2021 U.S. Dist. LEXIS 39777, at *12-13 (E.D. Ky. Mar. 3, 2021).  The Sixth Circuit has cautioned that "ALJs must be careful not to assume that a patient's failure to receive mental-health treatment evidences a tranquil mental state."  *White v. Comm'r of Soc.*

*Sec.*, 572 F.3d 272, 283 (6th Cir. 2009).  This reflects the challenging nature of some mental disorders, as the failure to seek treatment is another symptom of the disorder.  *Id.*

In applying this principle in *White*, the Sixth Circuit noted that White had an unexplained period in which she failed to seek treatment for her mental health.  *Id.* at 283-284.  And the court noted that a "reasonable mind" may find the lack of treatment indicative of an alleviation of White's symptoms.  *Id.* at 284.  Ultimately, the court held that substantial evidence supported the ALJ's non-disability determination because the clinical records supported that conclusion.  *Id.*; *see also Colman v. Comm'r of Soc. Sec.*, No. 1:15-CV-596, 2016 U.S. Dist. LEXIS 74114, at *26-27 (S.D. Ohio Jun. 7, 2016) (finding that the lack of explanation in the record as to why the claimant failed to seek mental health treatment made the ALJ's negative finding on that basis "not improper").

The ALJ applied proper standards and reached a decision supported by substantial evidence in finding that Kaser's subjective symptom complaints were not consistent with the medical evidence.  42 U.S.C. § 405(g); *Roger*, 486 F.3d at 241.  As to financial reasons, Kaser is exactly right.  The ALJ never mentioned any financial difficulties.  But for good reason – apart from a comment to Nurse Sharon Johnson, (*see* Tr. 457), Kaser never provided any evidence of financial difficulty.  Although the ALJ has a duty to consider reasons why the claimant may not have complied with treatment, she did not have a duty to create reasons not established in the record or proven by Kaser.  *Cottrell*, 2021 U.S. Dist. LEXIS 39777, at *13.  The burden of proving his disability remained squarely with Kaser.  20 C.F.R. § 416.912.  In my review of the record, I find little evidence to support that Kaser missed his various treatment opportunities because he could not afford to attend to treatments.  That may have been the case, but the court is not permitted to assume such facts or to fault the ALJ for failing to discuss the issue.

As to Kaser's agoraphobia and/or mental health limitations, the ALJ both considered and rejected Kaser's mental health problems as a cause of his non-compliance with recommended treatments.  Although the ALJ did not do so in one tidy paragraph, the court looks to the decision as a whole.  *See Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79.  In her decision, the ALJ repeatedly acknowledged Kaser's statements that his agoraphobia prevented him from leaving his home.  (Tr. 22-23, 29, 61-62, 64).  But the ALJ reasonably rejected these claims, because Kaser gave contradictory reasons for staying at home and the medical evidence was inconsistent with him being "homebound" due to his mental health.  Specifically, the ALJ cited instances when Kaser attributed his inability to make appointments to his physical health while stating that his agoraphobia and anxiety were improving or were controlled by medication.  (Tr. 30-31).  The ALJ also noted medical records indicating that Kaser's mental health was stable, that he was either not homebound or left home, or that his attendance at appointments was inconsistent with agoraphobia.  (Tr. 25-26, 30-32).  From this evidence within the longitudinal record, the ALJ reasonably concluded that Kaser's inconsistent compliance with recommended treatment was not caused by his agoraphobia. SSR 16-3p, 2016 SSR LEXIS 4 *15.

Substantial evidence supports the ALJ's conclusion.  Such evidence includes: (1) treatment notes indicating Kaser was "normal" or had a "bright" affect during doctors' appointments (Tr. 457, 521, 646-647, 692-693, 782); (2) treatment records indicating he was not homebound or attributing it to his physical limitations (Tr. 442, 671, 704-705, 709); (3) Kaser's own statements that it was the physical toll of leaving that kept him at home (Tr. 442, 582); and (4) Kaser's statements that his anxiety was improving or controlled through medication (Tr. 476-478).  A reasonable person, mindful of the difficulties of mental illness, could find such evidence adequate to substantiate the ALJ's conclusion.  *Biestek*, 139 S. Ct. at 1154.

Even if the ALJ erred, however, the record indicates that the ALJ had a number of other grounds which supported her inconsistency finding, many of which do not related to mental health and are all unchallenged by Kaser.  *See generally* ECF Doc. 11 at 15. Specifically, the ALJ found inconsistencies regarding: (1) Kaser's statements about the use of his cane and his stability (Tr. 26); (2) the records of his normal gait or statements about his walking, despite using a cane and wheelchair (Tr. 26, 28); (3) his ability to care for himself and make light meals for himself (Tr. 26); and (4) his lack of muscle atrophy or motor deficits despite using a wheelchair or lying in a bed for years.  (Tr. 27-28).  Because of these alternative findings, even if the ALJ had erred by not crediting Kaser's agoraphobia as a reason for treatment noncompliance, the ALJ's finding that his subjective symptom complaints were inconsistent with the medical evidence had several alternative bases.  Such grounds render any alleged error in the evaluation of the role of agoraphobia in causing treatment omissions to be harmless and an insufficient basis to remand.  *Rabbers*, 582 F.3d at 655-56; *see also Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x. 171, 173 (6th Cir. 2004) (noting that the court need not remand when it would be "an idle and useless formality") (internal quotation marks omitted).

Accordingly, a "reasonable mind" might find that Kaser's sporadic treatment was not attributable to his mental health, rendering the ALJ's decision within her "zone of choice." *Biestek*, 139 S. Ct. at 1154; *Mullen*, 800 F.2d at 545.  And it must be affirmed.

### V.     Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Kaser's application for SSI benefits be affirmed.

Dated: November 24, 2021

Thomas M. Parker
United States Magistrate Judge

---

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).